Filed 6/24/21  P. v. Gunn CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| THE PEOPLE, | C090455 |
| Plaintiff and Respondent, | (Super. Ct. No. CM028448) |
| v. | |
| JACK LEE GUNN, | |
| Defendant and Appellant. | |

Defendant Jack Lee Gunn was found to be a sexually violent predator (SVP) under the Sexually Violent Predator Act (Welfare and Institutions Code § 6600 et seq. (SVPA)), and committed to the custody of the California Department of State Hospitals for an indeterminate term.[1]  (*People v. Gunn* (July 24, 2018, C085173) [nonpub. opn.].)  He brought a petition for unconditional discharge from his SVP commitment in 2019 at

_____

[1] Undesignated statutory references are to the Welfare and Institutions Code.

1

the age of 84. (§ 6605.) A jury found defendant continued to meet the criteria for commitment as an SVP, and the trial court denied the petition.

Defendant appeals, arguing: (1) the trial court erred in failing to instruct the jury on the use of circumstantial evidence; (2) the trial court violated his due process rights by instructing the jury with CALCRIM No. 3454A, the pattern instruction for determining a committed person's current status under the SVPA; (3) the trial court erred in admitting certain exhibits without an applicable hearsay exception; (4) his trial counsel was ineffective for failing to object to expert testimony relating case-specific facts drawn from probation reports and other records; and (5) the trial court erred in excluding various witnesses. Defendant also contends he suffered cumulative prejudice from the asserted errors. Finding no reversible error, we affirm.

## I. BACKGROUND

Defendant was convicted of committing a lewd and lascivious act upon a child under the age of 14 years in 2001 after he repeatedly molested a five-year old girl (Victim 1) (Pen. Code, § 288, subd. (a)). (*People v. Gunn, supra,* C085173.) He was placed on probation for three years and ordered to serve 300 days in county jail. (*Ibid.*) Defendant stayed out of trouble until 2005, when he was convicted of annoying or molesting a child under 18 years of age with a prior sex offense (Pen. Code, § 647.6, subd. (c)(1)), after he molested a six-year old girl (Victim 2). (*People v. Gunn, supra,* C085173.)

Defendant was placed on probation for five years and ordered to participate in sex offender treatment. (*People v. Gunn, supra,* C085173.) As we shall see, defendant struggled to comply with the terms and conditions of probation. (*Ibid.*) Probation officers searched defendant's computer in 2010 and found materials deemed off limits. (*Ibid.*) The trial court revoked probation and sentenced defendant to three years in state prison. (*Ibid.*) Defendant was adjudicated an SVP and civilly committed to Coalinga State Hospital in 2013. (*Ibid.*) Defendant filed a petition for unconditional release from

2

civil commitment in May 2019.  (§ 6605.)  The petition was tried to a jury in August 2019.

A.    *The Prosecution's Evidence*

The prosecution presented two expert witnesses, both forensic psychologists employed or contracted by Department of State Hospitals to perform SVP evaluations.[2] Their testimony is summarized below.

1.    *Dr. Jeffrey Davis*

Dr. Jeffrey Davis conducted an SVP evaluation of defendant in January 2019.  In performing the evaluation, Dr. Davis reviewed numerous documents, including charging documents and probation reports, sex offender treatment records, probation violation reports, and hospital records.  Dr. Davis also interviewed defendant.  Based on the foregoing, Dr. Davis diagnosed defendant with pedophilic disorder, sexually attracted to females, nonexclusive type.

Dr. Davis based his diagnosis primarily on defendant's criminal history, as revealed in police and probation reports.  He considered the circumstances surrounding defendant's qualifying conviction, explaining that they resulted from a series of contacts with Victim 1 over a period of several months.  At the time, Victim 1 was five or six years old, and defendant was 66 years old.  Relying on a probation report, Dr. Davis testified that defendant fondled Victim 1's vaginal area, penetrated her vagina with his finger, and directed her to fondle his penis.  These contacts came to an end when Victim 1's mother effectively caught defendant in the act.  Defendant admitted the molestation and was convicted by plea in 2001.

When asked about the qualifying conviction by Dr. Davis, defendant acknowledged the sexual contact with Victim 1, but claimed the child initiated it.

---

[2] The prosecution's experts share the same surname:  Dr. Jeffrey Davis and Dr. Stephen Davis.  For clarity, we will sometimes refer to them by their full names.

3

Specifically, defendant maintained that Victim 1 grabbed his hand, placed it on her vaginal area, and directed him to rub her clitoris. According to Dr. Davis, defendant said he initially complied but then stopped, prompting Victim 1 to demand "more." Defendant added that he should have stopped but failed to do so. Dr. Davis found significant the fact that defendant continued to claim that Victim 1 had been the aggressor, some 18 years after the fact. Dr. Davis also noted that defendant had previously expressed a belief that Victim 1 experienced the molestation as "joyful." Dr. Davis explained that such a belief was consistent with cognitive distortion, which he described as a belief or beliefs that minimize culpability and facilitate sexual offending.

Dr. Davis found further support for the diagnosis of pedophilia in defendant's 2005 offense. By now, defendant was 70 years old and living in a trailer park. The trailer park was also home to a group of children. Despite his recent conviction for lewd and lascivious acts against a child, defendant invited another prepubescent girl, six-year old Victim 2, to enter his trailer to play games on his computer. While there, defendant rubbed Victim 2's buttocks. Dr. Davis found significant that defendant, "only four years after being caught for [lewd and lascivious acts against a child] and placed on probation, and going to treatment too, he commits another sexual offense against a similar aged female."

Dr. Davis's diagnosis was also informed by a series of probation violations and possible violations, many of which evinced a continuing preoccupation with children. These violations and possible violations are briefly summarized below.

In 2007, probation officers searched defendant's residence and found magazines containing photographs of young children. The magazines, though not pornographic, were nevertheless prohibited by defendant's probation. Later that year, defendant was observed in the park in the company of several small children. He was arrested and taken into custody, but ultimately found not to have violated probation.

4

In 2008, defendant moved to another trailer park, one with designated senior and non-senior sections. Defendant assured probation officers that he was moving to the senior section, but instead moved into the non-senior section, choosing a trailer that was right next door to one with three young children in residence. That children lived next door should have been obvious to defendant from the many toys strewn about the front yard. Defendant would later claim he had not seen the toys.

In 2009, defendant was again found in possession of magazines featuring photographs of young children. As before, the magazines were not pornographic, but were nevertheless prohibited by defendant's probation.

In 2010, defendant requested and received permission to have a laptop computer.[3] Defendant purchased the computer within the week. Shortly thereafter, a probation search revealed that he had visited numerous internet sites hosting children's cartoons. Defendant was admonished to stay away from such sites.

Defendant ran into trouble with the computer again the following year when another probation search revealed he had viewed questionable images of children, ranging in age from infants to 10 years old. (*People v. Gunn, supra,* C085173.) During the trial, Dr. Davis allowed that the images were neither pornographic, nor even sexually explicit.[4] Nevertheless, defendant had been told not to possess or view such photographs,

---

[3] Earlier that year, he appeared on *The Oprah Winfrey Show*, in an episode dealing with child molestation. Dr. Jeffrey Davis viewed portions of the episode and noted that defendant admitted more extensive sexual contacts with Victim 1 in his discussion with Oprah than he acknowledged in interviews with SVP evaluators. Defendant also told Oprah that he had fantasized about molesting Victim 1 before doing so.

[4] The images depicted fully clothed children, both boys and girls, in poses deemed "sexually suggestive" by the probation officer. Many of the images appear to have been "sight gags," in which children were shown in attitudes conveying a sexual double entendre (e.g., an image of a boy with a clown holding a balloon in a manner that suggests a penis extending from the boy's genital area).

5

and Dr. Davis was concerned both that they tended to normalize sexual contact with children and that they could be used to attract children as part of a grooming process. Dr. Davis thus opined that defendant's struggles with probation were relevant, not only to his diagnosis of pedophilia, but also to his assessment of defendant's risk of reoffending.

Dr. Davis explained that SVP evaluators cannot predict whether someone will act criminally in the future but can only estimate that person's risk of reoffending. He elaborated that SVP evaluators typically use actuarial assessment tools to estimate an SVP's risk of reoffending. The Static-99R is one such tool. (*People v. Shazier* (2014) 60 Cal.4th 109, 118.) The Static-99R uses 10 fixed—or "static"—factors to assess an SVP's risk of reoffending. An SVP evaluator assigns points for each factor based upon the SVP's history and measures the resulting score against recidivism rates by sample groups of offenders with the same score to determine whether the SVP poses an average or above or below average risk of reoffending. (*Id.* at p. 112 ["Based on recidivism rates among sample groups of convicted sex offenders," the Static-99R and similar actuarial tools "identify and assign numerical weights to established facts about a particular offender, such as his or her age and history of sexual convictions, as bases for predicting the likelihood he or she will commit new sex offenses"].)

Dr. Davis administered the Static-99R and scored defendant as "-1," a "very low" score that would ordinarily be associated with a below average risk of reoffending. However, Dr. Davis thought defendant's score failed to capture his real risk of reoffending. Dr. Davis explained that recidivism rates decline with advancing age, dropping off significantly after the age of 60. This decline is expressed as a negative number in the Static-99R (here, -3), which reduces an aging SVP's overall score. After the age of 70, Dr. Davis continued, recidivism rates decline so precipitously that meaningful comparisons with sample groups of other offenders are no longer possible.

Dr. Davis observed that defendant's offense pattern was "very unusual"—indeed, "blue moon rare"—in that he committed his first known offense after the age of 60,

6

ensuring he would receive the maximum age-related adjustment on the Static-99R. Dr. Davis noted that he had never seen such a pattern before. "And then," Dr. Davis continued, "to reoffend in his 70's is remarkable." Dr. Davis added that defendant's offense pattern was "really off the charts," "a real head scratcher," and "the exception that proves the rule."

Dr. Davis explained that an assessment with the Static-99R after defendant's first offense at the age of 66 would have indicated he presented a very low risk of reoffending. Yet, defendant defied the odds by reoffending at the age of 70. Under the circumstances, Dr. Davis opined that the Static-99R underestimated defendant's actual risk of reoffending.

Dr. Davis testified that he also administered the Structured Risk Assessment Forensic Version (SRA-FV), a tool that considers dynamic risk factors not addressed by the Static-99R.[5] This time, defendant's score indicated an above average risk of reoffending, though only slightly so. According to Dr. Davis, the SRA-FV was closer to capturing defendant's risk of reoffending, but still presented only part of the picture. As before, Dr. Davis opined that the usefulness of the risk assessment tool was limited by the fact that there are "very, very few offenders in any sample groups of [defendant's] age."

Ultimately, Dr. Davis concluded that neither the Static-99R nor the SRA-FV accurately assessed defendant's risk of reoffending. In the absence of an appropriate risk assessment tool, Dr. Davis relied upon structured clinical judgment, which considers static risk factors without applying actuarial scores, and dynamic risk factors, such as defendant's preoccupation with children and problems with supervision. Dr. Davis explained: "We see these pictures, for example, and problems with supervision and so forth throughout this period until he was revoked. So then looking at that, I would think

---

[5] The SRA-FV incorporates scores from the Hare Psychopathy Checklist Revised (PCLR), which Dr. Davis also administered. Defendant also scored low on the PCLR.

about what's different since then, since he was revoked?  Well, he's older.  Does being older convey the same protective buffer against reoffense in his case that it does for most offenders?  Well, the history says it doesn't for him.  He's quite rare that way."  Under the circumstances, Dr. Davis concluded that defendant continues to pose a serious and well-founded risk of sexual offense, despite his low scores on the Static-99R and SRA-FV.

2.      *Dr. Stephen Davis*

Dr. Stephen Davis, another forensic psychologist at Coalinga, testified for the prosecution as well.  Dr. Stephen Davis evaluated defendant in January 2019.  As part of his evaluation, Dr. Stephen Davis reviewed numerous documents, including police reports, probation reports, and hospital records.[6]  Dr. Stephen Davis also interviewed defendant.  Like Dr. Jeffrey Davis, Dr. Stephen Davis concluded that defendant suffers from pedophilic disorder, sexually attracted to females, nonexclusive type.

Dr. Stephen Davis explained that he based his diagnosis on defendant's offense pattern.  He noted that defendant admitted to digitally penetrating Victim 1 in a probation report.  When asked about the 2001 offense, defendant disclosed that he spent 18 months cultivating a relationship with Victim 1's family, a process Dr. Stephen Davis characterized as grooming.  Defendant also told Dr. Stephen Davis that Victim 1 had been the aggressor the first time he had sexual contact with her, and that she initiated the contact approximately 50 percent of the time.  Defendant said that he participated in the contact because he loved Victim 1 and wanted to make her feel good.  Defendant also said that Victim 1 was sexually provocative and enjoyed the molestation, statements that

_____

[6] Dr. Stephen Davis also reviewed assessments by other SVP evaluators.  Dr. Stephen Davis declined to review Dr. Jeffrey Davis's assessment, however, as he wanted to form his own, independent conclusions.

Dr. Stephen Davis described as "offense supportive beliefs." Defendant denied touching Victim 2.

In making his diagnosis, Dr. Stephen Davis also relied on defendant's admission in his SVP interview that he began having sexual fantasies about children at 64 or 65 years old. When asked whether he continued to fantasize about children, defendant responded elliptically, saying only that it would stand to reason that he did. Dr. Stephen Davis observed that defendant "went out of his way to be around children at every turn," noting that he was discovered in the park with children and found with materials that could be used to lure children. Dr. Stephen Davis opined that defendant suffers from volitional impairment, and "go[es] out of his way to create opportunities to offend without regard for the long-term impact of his victim."

Dr. Stephen Davis noted that defendant regularly attended sex offender treatment upon arriving at Coalinga, but effectively dropped out after 14 months, and then failed to return for an extended period of time. Although defendant had recently resumed treatment, he told Dr. Stephen Davis that he does not believe he needs it. Defendant's scattershot approach to treatment, and stated belief that Victim 1 enjoyed being molested, led Dr. Stephen Davis to conclude that defendant lacks insight and understanding into his offenses or risk factors.

Dr. Stephen Davis administered the Static-99R and scored defendant as "-1," or "below average risk." Dr. Stephen Davis also administered the SRA-FV and scored defendant as "low risk." Like Dr. Jeffrey Davis, however, Dr. Stephen Davis thought the Static-99R and SRA-FV failed to capture defendant's real risk of reoffending. Dr. Stephen Davis observed that defendant is an "idiosyncratic offender" in that he started having sexual fantasies about children at an age when most offenders are slowing down. Dr. Stephen Davis reiterated that defendant was constantly looking for opportunities to be around children as a member of the community, indicating a lack of insight and volitional impairment. He added that defendant had failed to advance in treatment and continued to

9

harbor offense supportive beliefs (e.g., Victim 1 enjoyed the molestation).  Under the circumstances, Dr. Stephen Davis concluded that defendant posed a serious and well-founded risk of reoffending upon release.

B.      *Defense Evidence*

Defendant also presented two expert witnesses, both forensic psychologists under contract with Department of State Hospitals to perform SVP evaluations.  Neither defense expert challenged the diagnosis of pedophilia.  Instead, defendant's experts focused on whether, at age 84, he still posed a serious and well-founded risk of reoffending.  That testimony is summarized below.

1.      *Dr. Douglas Korpi*

Dr. Douglas Korpi evaluated defendant twice.  Dr. Korpi evaluated defendant for the first time in 2012, when defendant was 77.  Dr. Korpi administered the Static-99R and scored defendant as "really, really low risk."  Recognizing the age-related limitations of the Static-99R, however, Dr. Korpi relied on clinical judgment to conclude that defendant was an SVP.

Dr. Korpi reevaluated defendant in 2019.  This time, Dr. Korpi concluded that defendant no longer presented a serious and well-founded risk of reoffending.  Dr. Korpi identified several reasons for his change in assessment.  First, Dr. Korpi noted that defendant was now seven years older, a change he found significant.  Dr. Korpi explained that the Los Angeles County District Attorney's Office reviewed records of 800 offenders from 1997 through 2016, and determined that 71 percent reoffended in their sixties, 26 percent reoffended in their seventies, and 3 percent reoffended in their eighties. Although Dr. Korpi had been prepared to say there was a high probability that defendant would reoffend in his seventies, he could not say that defendant was statistically likely to reoffend in his eighties.  Dr. Korpi acknowledged on cross-examination, however, that the analysis conducted by the Los Angeles County District Attorney's Office was neither peer reviewed nor published.

Second, Dr. Korpi observed that defendant does not have antisocial personality disorder or an extensive criminal history. He acknowledged, however, that defendant had run into problems with probation, and such problems are among the most important risk predictors.

Third, Dr. Korpi opined that defendant was a "light duty" pedophile. Though defendant had been sexually inappropriate with Victim 1, Dr. Korpi explained, he was "not the hardcore sort of pedophile that [Dr. Korpi] typically want[s] to put away in the hospital." Dr. Korpi allowed that defendant harbored offense supportive beliefs, adding that "only sex offenders" say their victims enjoyed being molested, as defendant had. Dr. Korpi also allowed that defendant exercised bad judgment in possessing photographs of children in 2010. However, Dr. Korpi saw no indication that defendant was sexually preoccupied or suffering from volitional impairment in 2019.

Finally, Dr. Korpi observed that defendant had received extensive sex offender treatment. Although defendant had not completed treatment, he had been exposed to it, and acknowledged he might have destroyed Victim 1's life. Accordingly, Dr. Korpi reversed his earlier assessment and concluded, "I think the fact of him not being very antisocial, not being very pedophiliac, and being old, and being in treatment so many times, I think that says we can let him go now."

       2.      *Dr. Timothy Salz*

Dr. Timothy Salz, a forensic psychologist and SVP evaluator under contract with the Department of State Hospitals, evaluated defendant and concluded he was not likely to reoffend if released. In reaching this conclusion, Dr. Salz found significant that defendant committed his first known offense at the age of 66, "which is kind of on the older side for sex offenses." Dr. Salz was also struck by the fact that defendant "only has this one really noteworthy sex offense," which was "unusual for patients down at the hospital." Indeed, Dr. Salz could not "think of a single patient down there who had a less

11

noteworthy sex offense history." Dr. Salz emphasized that the 2001 offense involving Victim 1 was defendant's most egregious offense in 18 years.

Dr. Salz considered defendant's 2005 offense involving Victim 2 "inappropriate, and something that he really should have known better," but not something that would have been "unusual" or "a big deal" had he not been a sex offender. As for the photographs, Dr. Salz was "sort of stunned that anybody would make such a big deal about [them]." Dr. Salz noted that the photographs were not pornographic, but were "sexually-toned sight gags," many of which featured male children, who are not part of defendant's preferred victim pool.

Dr. Salz administered the Static-99R and scored defendant "-1," or "below average." He also administered the SRA-FV and found that defendant was a "routine sex offender," rather than a high-risk offender. From this finding, Dr. Salz inferred that defendant's risk of reoffending was less than 2 percent over five years (compared with a 6 percent rate for high risk offenders). Dr. Salz noted that, according to the Social Security Administration, defendant's natural life expectancy was 90 to 91 years, suggesting that he might not live long enough to reoffend. Dr. Salz also administered the PCLR and found that defendant scored "very, very low."

Dr. Salz also considered various protective factors that reduced defendant's risk level. In addition to his age, Dr. Salz considered the fact that defendant had participated in sex offender treatment and appeared to have gained insight into his offense. Dr. Salz noted that the sex offender treatment program is "particularly long and intense, and typically takes an offender 10 years to get through." Dr. Salz also noted that defendant had been in the community for much of the time between 2001 and 2011 and "had ample opportunity to sexually offend in a more serious criminal way than he did." Based on the foregoing, Dr. Salz concluded that defendant does not pose a substantial and well-founded risk for reoffending.

*C.     Defense Witnesses*

Before jury selection, the prosecutor moved in limine to exclude the following defense witnesses on relevance grounds:  (1) Joe Lopez, a longtime friend who was prepared to support defendant financially and help him purchase a trailer should he be released; (2) Dr. Lester Cook, M.D., a doctor from Coalinga who treated defendant for depression; (3) Dr. Christopher North, an SVP evaluator who evaluated defendant in April 2017; (4)  Dr. Jordan Hopkins, a unit psychologist and member of defendant's treatment team; and (5) Renee Pierce, a unit supervisor at Coalinga.  The trial court granted the prosecutor's motion to exclude the testimony of Lopez, Pierce, and Dr. North. The trial court denied the motion to exclude the testimony of Drs. Cook and Hopkins.

During the trial, defense counsel elicited hearsay from Dr. Jeffrey Davis, based on conversations with Dr. Hopkins.  Dr. Davis explained that he had spoken to several people about defendant, adding that "he's described as respectful, polite, not a behavioral problem.  He tends to keep to himself.  He's social in a general sense, but he doesn't really socialize with anybody in particular."  During a bench conference, the prosecutor noted that she had not objected to Dr. Davis's testimony relating what Dr. Hopkins had said, and therefore, there was no reason to call Dr. Hopkins.  The trial court asked defense counsel whether he still intended to call Dr. Hopkins, and counsel responded, "I don't know yet."  The prosecutor rejoined that, in that case, she objected to the hearsay. Defense counsel responded, "I won't call her then."  He then continued his cross-examination of Dr. Davis, eliciting more hearsay based on information from Dr. Hopkins, including that defendant had not been caught with child pornography or sexually acting out at Coalinga.  The defense did not call Dr. Hopkins as a witness.

After Dr. Jeffrey Davis completed his testimony, the prosecutor renewed her motion to exclude Dr. Cook, this time for undue consumption of time.  The trial court granted the motion.

13

*D. Exhibits*

Towards the end of the trial, the trial court admitted the following documentary exhibits over defense objection: (1) a probation report for defendant's 2001 offense (Exhibit 15A); (2) a probation report for defendant's 2005 offense (Exhibit 18A); (3) a supplemental probation report describing defendant's violation of probation (Exhibit 19A); and (4) an extensively redacted SVP evaluation by Dr. Jack Vognsen (Exhibit 24A).

*E. Verdict and Commitment*

On August 30, 2019, the jury found that defendant was still an SVP, and the trial court ordered him committed to the Department of State Hospitals for an indeterminate term.

## II. DISCUSSION

*A. The SVPA*

"Under the SVPA, an offender who is determined to be an SVP is subject to involuntary civil commitment for an indeterminate term ' "immediately upon release from prison." ' " (*People v. Putney* (2016) 1 Cal.App.5th 1058, 1065 (*Putney*).) To establish that an offender is an SVP, the prosecution must prove beyond a reasonable doubt that the offender (1) has been convicted of a sexually violent offense against one or more victims, and (2) has a diagnosed mental disorder that makes him or her a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior. (§ 6600, subd. (a)(1).) "The SVPA is designed ' "to provide 'treatment' to mentally disordered individuals who cannot control sexually violent criminal behavior" ' and to keep them confined until they no longer pose a threat to the public." (*Putney, supra,* at p. 1065.)

"After commitment, an SVP is evaluated every year to consider 'whether the committed person currently meets the definition of a sexually violent predator and whether conditional release to a less restrictive alternative, pursuant to Section 6608, or

14

an unconditional discharge, pursuant to Section 6605, is in the best interest of the person and conditions can be imposed that would adequately protect the community." (*In re Butler* (2020) 55 Cal.App.5th 614, 628-629.)

"Section 6605, subdivision (a), provides that, when a court receives a petition for unconditional discharge, it holds a hearing to determine whether 'probable cause exists to believe that the committed person's diagnosed mental disorder has so changed that he or she is not a danger to the health and safety of others and is not likely to engage in sexually violent criminal behavior if discharged. ' " (*People v. Smith* (2020) 49 Cal.App.5th 445, 452.) Section 6605, subdivision (a)(2) provides that, if the trial court "determines that probable cause exists to believe that the committed person's diagnosed mental disorder has so changed that he or she is not a danger to the health and safety of others and is not likely to engage in sexually violent criminal behavior if discharged, then the court shall set a hearing on the issue." In that circumstance, section 6605, subdivision (a)(3) gives the committed person "the right to demand a jury trial and to have experts evaluate him or her on his or her behalf." At trial, the burden of proof is "on the state to prove beyond a reasonable doubt that the committed person's diagnosed mental disorder remains such that he or she is a danger to the health and safety of others and is likely to engage in sexually violent criminal behavior if discharged." (*Ibid.*)

B.     *CALCRIM Nos. 223 and 224*

Defendant argues the trial court erred by refusing to instruct the jury with CALCRIM Nos. 223 and 224 regarding the consideration of circumstantial evidence. The People appear to concede that CALCRIM Nos. 223 and 224 should have been given but argue any error was harmless. We accept the apparent concession and agree that the error was harmless.

" 'In considering a claim of instructional error we must first ascertain what the relevant law provides, and then determine what meaning the instruction given conveys. The test is whether there is a reasonable likelihood that the jury understood the

instruction in a manner that violated the defendant's rights.' [Citation.] We determine the correctness of the jury instructions from the entire charge of the court, not from considering only part of an instruction or one particular instruction. [Citation.] The absence of an essential element from one instruction may be cured by another instruction or the instructions taken as a whole. [Citation.] Further, in examining the entire charge we assume that jurors are ' " ' "intelligent persons and capable of understanding and correlating all jury instructions which are given." ' " ' " (*People v. Smith* (2008) 168 Cal.App.4th 7, 13.)

"Circumstantial evidence has been defined as ' "that which is applied to the principal fact, indirectly, or through the medium of other facts, from which the principal fact is inferred." ' [Citation.] If the prosecution is substantially relying on circumstantial evidence to establish any element of the case, the trial court has a sua sponte duty to give CALCRIM No. 223, defining direct and circumstantial evidence, and CALCRIM No. 224, instructing on how to evaluate circumstantial evidence. [Citations.] Generally, these instructions must both be given when circumstantial evidence is substantially relied upon for any element by the prosecution." (*People v. Smith, supra,* 168 Cal.App.4th at p. 14, fns. omitted.)[7]

---

[7] CALCRIM No. 223 provides: "Facts may be proved by direct or circumstantial evidence or by a combination of both. *Direct evidence* can prove a fact by itself. For example, if a witness testifies he saw it raining outside before he came into the courthouse, that testimony is direct evidence that it was raining. *Circumstantial evidence* also may be called indirect evidence. Circumstantial evidence does not directly prove the fact to be decided, but is evidence of another fact or group of facts from which you may logically and reasonably conclude the truth of the fact in question. For example, if a witness testifies that he saw someone come inside wearing a raincoat covered with drops of water, that testimony is circumstantial evidence because it may support a conclusion that it was raining outside. [¶] Both direct and circumstantial evidence are acceptable types of evidence to prove or disprove the elements of a charge, including intent and mental state and acts necessary to a conviction, and neither is necessarily more reliable than the other. Neither is entitled to any greater weight than the other. You must decide whether a fact in issue has been proved based on all the evidence."

The prosecution's case substantially relied on the expert opinions of Drs. Jeffrey Davis and Stephen Davis. Expert opinion testimony is commonly characterized as indirect or circumstantial evidence. (See, e.g., *People v. Gentry* (1968) 257 Cal.App.2d 607, 611; *People v. Di Giacomo* (1961) 193 Cal.App.2d 688, 695; *People v. Goldstein* (1956) 139 Cal.App.2d 146, 154; *People v. Jones* (1954) 42 Cal.2d 219, 222.) The jury was instructed on evaluating competing expert opinions (CALCRIM No. 332) and reasonable doubt in civil commitment proceedings (CALCRIM No. 219).[8] Defendant

---

CALCRIM No. 224 refers to the defendant's guilt or innocence, but the parties agree that the pattern instruction would need to be modified for use in an SVP case. As so modified, CALCRIM No. 224 would provide: "Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant [to be an SVP] has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt. [¶] Also, before you may rely on circumstantial evidence to find the defendant [to be an SVP], you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant [meets the SVP criteria]. If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to [not meeting the SVP criteria] and another to [meeting the SVP criteria], you must accept the one that points to [not meeting the SVP criteria]. However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable."

[8] The jury was instructed with CALCRIM No. 332 as follows: "Witnesses were allowed to testify as experts and to give opinions. You must consider the opinions, but you are not required to accept them as true or correct. The meaning and importance of any opinion are for you to decide. In evaluating the believability of an expert witness, follow the instructions about the believability of witnesses generally. In addition, consider the expert's knowledge, skill, experience, training, and education, the reasons the expert gave for any opinion, and the facts or information on which the expert relied in reaching that opinion. You must decide whether information on which the expert relied was true and accurate. [¶] You may disregard any opinion that you find unbelievable, unreasonable, or unsupported by the evidence. [¶] An expert witness may be asked a hypothetical question. A hypothetical question asks the witness to assume certain facts are true and to give an opinion based on the assumed facts. It is up to you to decide whether an assumed fact has been proved. If you conclude that an assumed fact is not true, consider the effect of the expert's reliance on that fact in evaluating the expert's opinion. [¶] If the expert

17

argues jurors should have also been instructed that, if the experts' opinion testimony supported two reasonable inferences, one leading to the conclusion that he meets the SVP criteria and another leading to the conclusion he does not, they were obligated to accept the inference leading to the conclusion that he does not meet the SVP criteria.

We are not aware of any published authority addressing whether circumstantial evidence instructions are required in SVP proceedings.[9] In the absence of any such authority, defendant argues by analogy to other civil commitment schemes. (See *People v. Contreras* (2010) 184 Cal.App.4th 587, 591-593 [trial court properly instructed jury with CALCRIM No. 224 in civil commitment proceeding for mentally disordered offender]; and see *Conservatorship of Walker* (1987) 196 Cal.App.3d 1082, 1094-1095 [trial court instructed jury with BAJI No. 2.00 (defining direct and circumstantial evidence) but erroneously refused to give proposed instruction on evaluating circumstantial evidence in civil proceeding to appoint a conservator for a mentally ill

---

witnesses disagreed with one another, you should weigh each opinion against the others. You should examine the reasons given for each opinion and the facts or other matters on which each witness relied. You may also compare the experts' qualifications."

The jury was instructed with CALCRIM No. 219 as follows: "The fact that a petition to declare Respondent a current sexually violent predator has been filed is not evidence that the petition is true. You must not be biased against the Respondent just because the petition has been filed and this matter has been brought to trial. The Petitioner is required to prove the allegations of the petition are true beyond a reasonable doubt. [¶] Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the allegations of the petition are true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt. [¶] In deciding whether the Petitioner has proved the allegations of the petition are true beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. Unless the evidence proves the Respondent is currently a sexually violent predator beyond a reasonable doubt, you must find the petition is not true."

[9] We disregard defendant's discussion of unpublished opinions touching on this issue. (California Rules of Court, rule 8.1115, subd. (a).)

person under the Lanterman-Petris-Short Act].) The People appear to accept the analogy and concede error. We agree that the trial court should have instructed the jury with CALCRIM Nos. 223 and 224.

We turn to the question of prejudice. Defendant argues the trial court violated his federal constitutional right to due process, requiring review under the harmless beyond a reasonable doubt standard established by *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*). We disagree. A trial court does not commit error of constitutional dimension by failing to instruct on circumstantial evidence if it has properly instructed on reasonable doubt. As our Supreme Court explained in *People v. Rogers* (2006) 39 Cal.4th 826: "Insofar as the federal Constitution itself does not require courts to instruct on the evaluation of circumstantial evidence where, as here, the jury was properly instructed on reasonable doubt [citations], defendant's claim necessarily rests on the asserted arbitrary denial of a state-created liberty interest. [Citation.] We doubt the common law right to a circumstantial evidence instruction rises to the level of a liberty interest protected by the due process clause." (*Id.* at pp. 886-887; see also *People v. Smith, supra,* 168 Cal.App.4th at pp. 18-19.) The jury here was properly instructed with CALCRIM No. 219 on reasonable doubt and the People's burden of proof. We therefore review the error under the standard established by *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*), which requires reversal only if "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Id.* at p. 836.)

To prove that defendant was still an SVP, the prosecution was required to show that he was "convicted of a sexually violent offense against one or more victims," has "a diagnosed mental disorder," and is "a danger to the health and safety of others" because he is "likely" to "engage in sexually violent criminal behavior." (§ 6600, subd. (a)(1).) It was undisputed that defendant was convicted of a sexually violent offense and has a diagnosed mental disorder. Thus, the only issue for the jury was whether he was "likely"

19

to "engage in sexually violent criminal behavior." (§ 6600, subd. (a); *People v. Superior Court* (*Ghilotti*) (2002) 27 Cal.4th 888, 922 [" '*likely*' . . . connotes much more than the mere *possibility* that the person will reoffend," but "does not require a precise determination that the chance of reoffense is *better than even*. . . . [T]he person is 'likely' to reoffend if . . . the person presents a *substantial danger,* that is, a *serious and well-founded risk*, that he or she will commit such crimes if free in the community"].)

We perceive no reasonable probability that defendant would have obtained a more favorable result had the jury been instructed with CALCRIM Nos. 223 and 224. Although CALCRIM Nos. 223 and 224 were technically required here given the prosecution's reliance on expert testimony (see *People v. Gentry, supra,* 257 Cal.App.2d at p. 611), we do not believe that either instruction would have made much of a difference to defendant in the particular circumstances of this case. True, most of the evidence was circumstantial, in the sense that most of the evidence was expert testimony. But the underlying facts were almost entirely undisputed. All testifying experts agreed, for example, that defendant received low scores on the Static-99R and SRA-FV, but he failed to complete sex offender treatment and continued to harbor offense supportive beliefs. Where they differed was in their application of professional judgment to the undisputed facts. The jury's task was thus to choose between opposing expert opinions drawn from undisputed facts. Had jurors believed that prosecution and defense experts' opinions were equally reasonable, CALCRIM No. 224 would have required them to find that defendant did not meet the SVP criteria. (See CALCRIM No. 224 ["If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to [not meeting the SVP criteria] and another to [meeting the SVP criteria], you must accept the one that points to [not meeting the SVP criteria]"].) But the jury received the same guidance from CALCRIM Nos. 332 and 219, which instructed jurors to weigh the experts' opinions against one another and satisfy themselves that the prosecution had established that defendant was currently an SVP

20

beyond a reasonable doubt. (See CALCRIM Nos. 332 ["If the expert witnesses disagreed with one another, you should weigh each opinion against the others"] and 219 ["In deciding whether the Petitioner has proved the allegations of the petition are true beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. Unless the evidence proves the Respondent is currently a sexually violent predator beyond a reasonable doubt, you must find the petition is not true"].) In the circumstances of the present case, where the jury was tasked with choosing between competing interpretations of the facts, rather than deciding the facts themselves, we can safely say that jurors received the same message from CALCRIM Nos. 332 and 219 as they would have from CALCRIM Nos. 223 and 224. Reasonable jurors would have understood from the instructions as a whole that they were required to find defendant was not currently an SVP if they found the expert testimony reasonably supported the conclusion he no longer posed a serious and well-founded risk of reoffending. (*People v. Ayers* (2005) 125 Cal.App.4th 988, 997 ["Jurors are presumed to be intelligent people, capable of understanding and correlating all instructions"].) The jury here resolved the conflict in expert opinions against defendant and found the prosecution's experts more credible. There is no reasonable probability that defendant would have a received a more favorable result had CALCRIM Nos. 223 and 224 been given.

C.    *CALCRIM No. 3454A*

Defendant next challenges the trial court's instruction with CALCRIM No. 3454A, the pattern instruction for proceedings under section 6605. Defendant's arguments concerning CALCRIM No. 3454A were not raised in the trial court, and we question whether they were properly preserved for appellate review. (*People v. Virgil* (2011) 51 Cal.4th 1210, 1260 [party's failure to object to jury instructions forfeits the claim on appeal].) Nevertheless, defendant urges us to excuse the failure to object on the ground that the instruction affected his substantial rights (Pen. Code, § 1259), and the

21

People do not argue forfeiture. We will therefore consider the merits of defendant's challenge to CALCRIM No. 3454A.

Jurors were instructed with CALCRIM No. 3454A in pertinent part as follows: "The People allege that Jack Lee Gunn is currently a sexually violent predator. To prove this allegation, the People must prove beyond a reasonable doubt that: [¶] 1: He has a diagnosed mental disorder; [¶] AND [¶] 2: As a result of that diagnosed mental disorder, he is a danger to the health and safety of others because it is likely that he will engage in sexually violent predatory criminal behavior. [¶] The term diagnosed mental disorder includes conditions either existing at birth or acquired after birth that affect a person's ability to control emotions and behavior and predispose that person to commit criminal sexual acts to an extent that makes him or her a menace to the health and safety of others. [¶] A person is likely to engage in sexually violent predatory criminal behavior if there is a substantial danger, that is, a serious and well-founded risk that the person will engage in such conduct if released in the community. [¶] . . . [¶] *You may consider evidence that Jack Lee Gunn failed to participate in or complete the State Department of Mental Health Sex Offender Commitment Program as an indication that his condition as a sexually violent predator has not changed.* The meaning and importance of that evidence is for you to decide. [¶] You may not conclude that Jack Lee Gunn is currently a sexually violent predator based solely on his prior convictions without *additional evidence* that he currently has such a diagnosed mental disorder." (Original emphasis omitted; new emphasis added.)

CALCRIM No. 3454A is based on section 6605, which provides in pertinent part: "The burden of proof at the hearing [for unconditional discharge] shall be on the state to prove beyond a reasonable doubt that the committed person's diagnosed mental disorder remains such that he or she is a danger to the health and safety of others and is likely to engage in sexually violent criminal behavior if discharged. Where the person's failure to participate in or complete treatment is relied upon as proof that *the person's condition*

22

*has not changed*, and there is evidence to support that reliance, the jury shall be instructed substantially as follows:  [¶]  'The committed person's failure to participate in or complete the State Department of State Hospitals Sex Offender Commitment Program (SOCP) are facts that, if proved, may be considered as evidence that the committed person's condition has not changed.  The weight to be given that evidence is a matter for the jury to determine.' "  (§ 6605, subd. (a)(3), emphasis added.)

CALCRIM No. 3454A also incorporates section 6600, subdivision (a)(3), which provides in pertinent part:  "Jurors shall be admonished that they may not find a person a sexually violent predator based on prior offenses absent *relevant evidence* of a currently diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior." (Emphasis added.)

Defendant argues CALCRIM No. 3454A deviates from sections 6605, subdivision (a)(3) and 6600, subdivision (a)(3) in material respects.  First, he observes that CALCRIM No. 3454A authorizes the jury to consider evidence that a committed person failed to participate in or complete treatment as "an indication that his *condition as a sexually violent predator* has not changed."  (Emphasis added.)  By contrast, section 6605, subdivision (a)(3) provides that jurors must be instructed "substantially" that the committed person's failure to participate in or complete treatment may be considered as "evidence that the committed person's *condition* has not changed."  (Emphasis added.) Second, defendant observes that CALCRIM No. 3454A instructed jurors they could not conclude he was an SVP based solely on his prior convictions without "*additional* evidence" that he currently has a diagnosed mental disorder, while section 6600, subdivision (a)(3) specifies that jurors may not find a person an SVP based on prior offenses absent "*relevant* evidence" of a currently diagnosed mental disorder. (CALCRIM No. 3454A, emphasis added; § 6600, subd. (a)(3), emphasis added.) Together, defendant says, these differences allowed the jury to find he was still an SVP

23

based solely on evidence he failed to complete sex offender treatment, without finding beyond a reasonable doubt that he continues to have a diagnosed mental disorder that makes him a danger to the health and safety of others, in violation of his right to due process.[10] We are not persuaded.

Defendant argues that the word "condition," as used in section 6605, subdivision (a)(3), should be understood to refer to the committed person's "diagnosed mental disorder." When so read, defendant continues, the statute calls for an instruction allowing jurors to consider evidence of a failure to participate in or complete treatment as an indication that the committed person's *diagnosed mental disorder* has not changed. Defendant argues CALCRIM No. 3454A impermissibly authorizes jurors to consider evidence of the committed person's failure to participate in or complete treatment as an indication that the person's *condition as an SVP has not changed*, thereby sweeping more broadly than the statute, and relieving the prosecution of the burden of proving the other SVP criterion beyond a reasonable doubt; namely, that he was still a danger to the health and safety of others. We disagree with defendant's interpretation of section 6605, subdivision (a)(3).

" 'Our fundamental task in interpreting a statute is to determine the Legislature's intent so as to effectuate the law's purpose. We first examine the statutory language, giving it a plain and commonsense meaning. We do not examine that language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment. If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences [that] the Legislature did not intend.

---

**10** Defendant also observes that CALCRIM No. 3454A and section 6600, subdivision (f) differ slightly in their discussions of "recent overt acts." However, he appears to concede the differences are immaterial and does not attempt to explain how they prejudiced him.

If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy.' " (*Jarmon v. HCR ManorCare, Inc.* (2020) 10 Cal.5th 375, 381.)

Defendant's interpretation of section 6605, subdivision (a)(3) turns on the meaning of the word "condition." The Merriam-Webster Online Dictionary defines the noun "condition," in pertinent part, as "a state of being" (e.g., "the human condition"), a "social status," and "a usually defective state of health" (e.g., "a serious heart condition"). (Merriam-Webster Online Dict. <https://www.merriam-webster.com/dictionary/condition> [as of June 22, 2021], archived at <https://perma.cc/P8DL-28GY> .) Defendant assumes the word "condition" refers to a committed person's hitherto "defective state of health," which would encompass any diagnosed mental disorder. But we believe the word "condition" was intended here in the broader sense of a "a state of being" or "status," such as the condition of being an SVP.

We find support for this interpretation in section 6605, subdivision (a)(2), which provides for a probable cause hearing to determine whether "the committed person's *diagnosed mental disorder* has so changed that he or she is not a danger to the health and safety of others and is not likely to engage in sexually violent criminal behavior if discharged." (Emphasis added.) Had the Legislature intended to limit the jury's consideration of the committed person's failure to participate in or complete treatment to the presence or absence of a diagnosed mental disorder, it could have done so, as it did in the immediately preceding subdivision. That the Legislature chose instead to authorize a jury instruction contemplating jury consideration of treatment failures "as evidence that the committed person's *condition* has not changed," argues in favor of a broader construction, one that sensibly allows jurors to consider the evidence for any relevant purpose.

Our construction comports with case law recognizing that "participation in treatment is an important factor when determining whether an SVP is no longer

dangerous." (*People v. LaBlanc* (2015) 238 Cal.App.4th 1059, 1077; see *id.* at p. 1078 [holding that the defendant's refusal to participate in sex offender treatment was "certainly evidence from which a trier of fact may conclude [he] continues to pose a danger"].) It is also consistent with the treatment and public safety purposes of the SVPA. (*Putney, supra,* 1 Cal.App.5th at p. 1065 ["The SVPA is designed ' "to provide 'treatment' to mentally disordered individuals who cannot control sexually violent criminal behavior" ' and to keep them confined until they no longer pose a threat to the public"]; *People v. Sumahit* (2005) 128 Cal.App.4th 347, 355 ["The SVPA's primary goal is treatment. 'The Act provides treatment for mental disorders from which [sex offenders] currently suffer and reduces the threat of harm otherwise posed to the public' "].) These statutory purposes would be ill-served by an instruction authorizing jurors to consider evidence of a committed person's treatment failures only for the limited purpose of determining whether he still suffers from a diagnosed mental disorder, but not for the essential purpose of determining whether he continues to pose a danger to the health and safety of others. We therefore reject defendant's interpretation of section 6600, subdivision (a)(3). Having done so, we conclude no conflict exists between the statute and the instruction, at least so far as the jury's consideration of treatment evidence is concerned.

We now turn to defendant's argument that CALCRIM No. 3454A conflicts with section 6600, subdivision (a)(3). As noted, CALCRIM No. 3454A instructed jurors they could not conclude defendant was an SVP based solely on his prior convictions without "*additional* evidence" he currently has a diagnosed mental disorder, while section 6600, subdivision (a)(3) specifies that jurors may not find a person an SVP based on prior offenses absent "*relevant* evidence" of a currently diagnosed mental disorder. (CALCRIM No. 3454A, emphasis added; § 6600, subd. (a)(3), emphasis added.) We need not parse the differences between section 6600, subdivision (a)(3) and CALCRIM No. 3454A, because we perceive no possibility they could have contributed to the verdict.

26

It was undisputed that defendant continues to suffer from a diagnosed mental disorder. Whether the jury was instructed to look for "additional evidence" or "relevant evidence" of a currently diagnosed mental disorder would not have changed anything. The error, if any, was harmless under any standard. (*Watson, supra,* 46 Cal.2d at p. 836; *Chapman, supra,* 386. U.S. at p. 24.)

C.    *Documentary Evidence*

Defendant next challenges the admission of four documentary exhibits, arguing they should have been redacted or excluded because they contained inadmissible hearsay. We agree that much of this evidence was "hearsay that was not shown to fall within a hearsay exception." (*People v. Burroughs* (2016) 6 Cal.App.5th 378, 411.) Nevertheless, we find no reversible error.

1.    *Applicable Evidentiary Principles and Standard of Review*

As a general rule, hearsay evidence—"evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated" (Evid. Code, § 1200, subd. (a))—is inadmissible, except as provided by law (*id.*, subd. (b)). "Documents like reports, criminal records, hospital records, and memoranda—prepared outside the courtroom and offered for the truth of the information they contain—are usually themselves hearsay and may contain multiple levels of hearsay, each of which is inadmissible unless covered by an exception." (*People v. Yates* (2018) 25 Cal.App.5th 474, 482.)

The Legislature has expanded the scope of admissible hearsay evidence in SVP proceedings. Section 6600, subdivision (a)(3) provides: "Conviction of one or more crimes enumerated in this section shall constitute evidence that may support a court or jury determination that a person is a sexually violent predator, but shall not be the sole basis for the determination. The existence of any prior convictions may be shown with documentary evidence. The details underlying the commission of an offense that led to a prior conviction, including a predatory relationship with the victim, may be shown by

documentary evidence including, but not limited to, preliminary hearing transcripts, trial transcripts, probation and sentencing reports, and evaluations by the State Department of State Hospitals."

Section 6600, subdivision (a)(3) thus creates a broad hearsay exception for documentary evidence to prove the existence and details underlying the commission of the offenses leading to prior convictions and to the defendant's predatory relationship with the victim. (*People v. Otto* (2001) 26 Cal.4th 200, 206-207 [§ 6600, subd. (a)(3) "authorizes the use of hearsay in presentence reports to show the details underlying the commission of a predicate offense"].) "By permitting the use of presentence reports at the SVP proceeding to show the details of the crime," our Supreme Court has explained, "the Legislature necessarily endorsed the use of multiple-level-hearsay statements that do not otherwise fall within a hearsay exception." (*Id.* at p. 208.) Portions of otherwise admissible reports containing information that does not pertain to the defendant's qualifying conviction, however, are not made admissible by section 6600, subdivision (a)(3). (*People v. Burroughs, supra,* 6 Cal.App.5th at pp. 410-411.)

Another hearsay exception is relevant here, the exception for statements made by a party opponent (we refer to this as the party admission exception), codified at Evidence Code section 1220. The party admission exception applies as follows: "The evidence was of statements, defendant was the declarant, the statements were offered against him, and he was a party to the action. Accordingly, the hearsay rule does not make the statements inadmissible." (*People v. Carpenter* (1999) 21 Cal.4th 1016, 1049.)

The hearsay rules governing testimony by expert witnesses are also relevant, though only tangentially so. Our Supreme Court announced significant changes in the law relating to testimony by expert witnesses in *People v. Sanchez* (2016) 63 Cal.4th 665. Before *Sanchez*, expert witnesses were permitted to relate case-specific hearsay to the jury, so long as jurors were told that they could only consider such information for its effect on the expert's opinion, and not for its truth. (*People v. Yates, supra,* 25

Cal.App.5th at p. 482.) *Sanchez* ended this practice. (*Ibid.*) In the post-*Sanchez* world, an expert witness "may still *rely* on hearsay in forming an opinion, and may tell the jury *in general terms* that he did so." (*Sanchez, supra,* at p. 685; see Evid. Code, §§ 801, 802.) But an expert may no longer "relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or covered by a hearsay exception." (*Sanchez, supra,* at p. 686.) "The *Sanchez* rule applies to civil SVP proceedings." (*People v. Bocklett* (2018) 22 Cal.App.5th 879, 890 [applying *Sanchez* to SVP jury trial adjudicating defendant an SVP]; see also *People v. Burroughs, supra,* 6 Cal.App.5th at p. 403.)

"A trial court's ruling on the admissibility of evidence, including one that turns on the hearsay nature of the evidence, is reviewed under the abuse of discretion standard." (*People v. Roa* (2017) 11 Cal.App.5th 428, 442; see also *People v. Waidla* (2000) 22 Cal.4th 690, 725.) Any error regarding the admission of such evidence requires reversal only if "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Watson, supra,* 46 Cal.2d at p. 836.)

### 2. *Challenges to Exhibits*

Defendant observes the prosecution's experts related inadmissible case-specific hearsay in their testimony, and we do not disagree. However, defendant largely failed to object to the prosecution's expert testimony in the trial court and does not challenge the admission of such testimony on appeal. Instead, defendant focuses on the documentary exhibits on which the experts relied. We consider defendant's challenges to the exhibits below.

### a. *Exhibit 15A*

Defendant first challenges the admission of Exhibit 15A, the probation report for defendant's 2001 offense involving Victim 1. Dr. Jeffrey Davis properly relied on Exhibit 15A to relate the circumstances giving rise to defendant's qualifying conviction.

(§ 6600, subd. (a)(3); *People v. Otto, supra,* 26 Cal.4th at p. 207.) Defendant acknowledges that much of the report was admissible. However, he argues that Exhibit 15A also contains information unrelated to his qualifying conviction, which should have been redacted. We perceive no error.

Defendant objected to Exhibit 15A on hearsay grounds, pointing to the probation report's discussion of another psychologist's evaluation of him. As relevant here, Exhibit 15A indicated that defendant admitted sexually abusing Victim 1 in an interview with the other psychologist and told the psychologist that he " 'possibly had sexual feelings for younger children of about ten years of age.' " Exhibit 15A also indicated the psychologist believed defendant was "plagued by anxiety about the future," given to " 'extreme and bizarre thoughts,' " and likely suffering from " '[c]hronic psychological maladjustment.' " Defendant made no other objections to Exhibit 15A. The trial court overruled defendant's objection and admitted the report.

We agree with defendant that the report's twice-repeated discussion of the other psychologist's evaluation was not covered by the hearsay exception created by section 6600, subdivision (a)(3). But we cannot say the trial court erred in admitting the report in the circumstances of this case. The prosecution's experts testified without objection that defendant admitted sexually abusing Victim 1 and admitted having sexual fantasies about children. Much of the complained-of evidence was thus already before the jury. Although there was no other evidence that defendant suffered from anxiety, extreme thoughts, or chronic psychological maladjustment, the report's references to these aspects of the psychologist's evaluation could not have made any difference to jurors presented with unanimous expert testimony that defendant suffered from a diagnosed mental disorder. On the record before us, we conclude that any error in admitting portions of the report describing the other psychologist's evaluation of defendant was harmless. Defendant's other objections to Exhibit 15A were not raised in the trial court and have therefore been forfeited. (*People v. Partida* (2005) 37 Cal.4th 428, 435.)

30

### b. *Exhibit 18A*

Defendant next challenges the admission of Exhibit 18A, the probation report for the 2005 offense involving Victim 2. Defendant objected to Exhibit 18A on hearsay grounds and argues the report should have been excluded in its entirety. He observes that the 2005 offense was not a qualifying offense, and thus was not covered by the hearsay exception created by section 6600, subdivision (a)(3). We do not disagree with this last point. (*People v. Burroughs, supra,* 6 Cal.App.5th at p. 411.) Even so, most of the complained-of material from the exhibit was already before the jury in the form of expert testimony from Dr. Jeffrey Davis, who testified to the circumstances surrounding the 2005 offense without objection. Defendant does not identify any other prejudice that could have resulted from the admission of Exhibit 18A. Under the circumstances, we conclude that any error in admitting Exhibit 18A was harmless.

### c. *Exhibit 19A*

Defendant next challenges the admission of Exhibit 19A, the supplemental probation report for defendant's 2011 violation of probation. Defendant objected to Exhibit 19A on hearsay grounds and argues the trial court should have excluded the report in its entirety. As before, defendant argues the probation violation was not a qualifying offense, and thus, not covered by section 6600, subdivision (a)(3). Here again, we find no prejudice from any error

Dr. Jeffrey Davis testified extensively about defendant's problems with supervision. Dr. Davis recounted the probation search of defendant's laptop and commented upon the photographs found there, many of which were independently admitted and published to the jury, without objection.[11] With an exception not relevant here, defendant made no objection to the photographs or any testimony based on Exhibit

---

[11] Indeed, defendant's trial counsel offered several of the photographs into evidence.

31

19A.[12]  As before, the jury had already heard most of the complained-of material from the report by the time defendant interposed an objection.  Under the circumstances, we conclude, again, that defendant could not have been prejudiced by any error in admitting the exhibit.

### d.     Exhibit 24A

Defendant next challenges the trial court's admission of Exhibit 24A, an extensively redacted SVP evaluation by Dr. Jack Vognsen.  Dr. Vognsen evaluated defendant in 2012 and prepared a report which states:  "After the death of his wife and his conviction for the offenses against [Victim 1], Mr. Gunn reported that 'my sex drive went to the toilet.' "  The trial court admitted the redacted evaluation as a party admission over defense objection, and the prosecutor used the exhibit to elicit testimony from Dr. Stephen Davis that defendant reoffended after representing that his libido had failed him.  Defendant argues the exhibit contained hearsay not made admissible by any exception, and we agree.  Although the statement attributed to defendant may have been admissible as a party admission or nonhearsay, that statement was part of a longer statement attributed to Dr. Vognsen, which was neither.  The trial court should not have admitted Exhibit 24A.

Although we find error in admitting Exhibit 24A, we conclude, again, that the error was harmless.  Evidence that defendant may have misrepresented his sex drive in 2012 could not have caused prejudice given the defense theory, as expressed by Dr. Korpi, that defendant had been an SVP in 2012, but was no longer an SVP in 2019.  On the record before us, we discern no prejudice from the erroneous admission of Exhibit 24A.

---

[12] Defendant objected to testimony that he failed to complete homework required for his sex offender treatment program.

*D.      Ineffective Assistance of Counsel*

Defendant argues his trial counsel was constitutionally ineffective for failing to object to case-specific hearsay in expert testimony and failing to object to unspecified photographs.  The People do not address this argument.

To establish ineffective assistance of counsel, a defendant must show both that counsel's representation fell below an objective standard of reasonableness and that it is reasonably probable that, but for counsel's error, the result of the proceeding would have been different.  (*Strickland v. Washington* (1984) 466 U.S. 668, 686-688; *People v. Benavides* (2005) 35 Cal.4th 69, 92-93; *People v. Ledesma* (1987) 43 Cal.3d 171, 215-218.)  " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " (*Ledesma, supra,* at p. 218.)

In reviewing a claim of ineffective assistance, we "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.  [Citation.]  Tactical errors are generally not deemed reversible, and counsel's decisionmaking must be evaluated in the context of the available facts.  [Citation.]  To the extent the record on appeal fails to disclose why counsel acted or failed to act in the manner challenged, we will affirm the judgment unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation." (*People v. Maury* (2003) 30 Cal.4th 342, 389; see also *People v. Hayes* (1990) 52 Cal.3d 577, 621 ["Whether to object to inadmissible evidence is a tactical decision"].)

We find no ineffective assistance of counsel.  Defendant's trial counsel may have reasonably believed that defendant would be more helped than hurt by the details of his non-qualifying offense and probation violation, to which Dr. Jeffrey Davis testified without objection.  A pervasive defense theme was that defendant was a "light duty" pedophile, whose criminal record was milder than most SVPs to begin with and becoming milder still with advancing age.  With respect to the 2005 offense, Dr. Salz

opined: "[I]f you just look at the offense itself; you know, patting a 6-year old girl's bottom over the clothing, is not something that's all that unusual. And I dare say that many, if not most of us, have done that in a way that was nonsexual, and really not a big deal." With respect to the photographs, Dr. Salz testified: "I saw the write-up that included those 46 photos, and I was sort of stunned that anybody would make such a big deal about it." Dr. Korpi similarly suggested that defendant's possession of the photographs spoke more to a lapse in judgment than any real risk of reoffending. Both defense experts emphasized that defendant had not been found with similar photographs at Coalinga. On the record before us, trial counsel could have rationally believed that jurors should know the details of the non-qualifying offense and probation violation, so they would understand that neither was as serious as the qualifying offense, and neither would have been a crime but for defendant's status as a repeat offender. We cannot say this plausible, tactical decision amounted to ineffective assistance of counsel. (See *People v. Earp* (1999) 20 Cal.4th 826, 896.)

E.      *Defense Witnesses*

Defendant next argues the trial court violated his right to present a defense by excluding the testimony of the following five witnesses: (1) Lopez, defendant's longtime friend; (2) Dr. Cook, a doctor from Coalinga; (3) Dr. North, an SVP evaluator; (4) Dr. Hopkins, a unit psychologist and member of defendant's treatment team; and (5) Pierce, a unit supervisor at Coalinga.[13] We are not persuaded.

"A trial court's decision to admit or exclude evidence is reviewed for abuse of discretion, and it will not be disturbed unless there is a showing that the trial court acted in an arbitrary, capricious, or absurd manner resulting in a miscarriage of justice. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.) Evidence Code section 352 gives the trial court

---

[13] As we shall discuss, the trial court did not, in fact, exclude Dr. Hopkins' testimony

discretion to exclude evidence if 'its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' " (*People v. Wall* (2017) 3 Cal.5th 1048, 1069.)[14]

We review a trial court's ruling under Evidence Code section 352 for abuse of discretion. (*People v. Lewis* (2001) 26 Cal.4th 334, 372-373.) " 'It is . . . well settled that the erroneous admission or exclusion of evidence does not require reversal except where the error or errors caused a miscarriage of justice. [Citation.] "A 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." ' " (*People v. Fields* (2009) 175 Cal.App.4th 1001, 1018.)

The trial court did not abuse its discretion by excluding Lopez's testimony. Lopez would have testified that he was prepared to support defendant financially and help defendant purchase a trailer should he be released. This testimony was relevant to defendant's plans for release, which were relevant to his risk of reoffending. Even so, the trial court could reasonably conclude that the probative value of the testimony was minimal and substantially outweighed by the potential for wasted time and juror confusion. It is true, as defendant observes, that Dr. Stephen Davis questioned his release plans. However, Dr. Davis questioned the wisdom of defendant's plan to live in a trailer park, not his ability to purchase a trailer. Neither Dr. Davis nor anyone else cast doubt on

---

[14] The trial court did not expressly invoke Evidence Code section 352 in excluding the proffered defense witnesses. However, the trial court "is not required to ' "expressly weigh prejudice against probative value or even expressly state that it has done so, if the record as a whole shows the court was aware of and performed its balancing function under Evidence Code section 352." ' " (*People v. Nunez & Satele* (2013) 57 Cal.4th 1, 31.)

defendant's financial stability. Likewise, no expert opined that financial pressures could contribute to defendant's risk of reoffending. We find no abuse of discretion in the trial court's ruling excluding the proffered testimony of Lopez.

We reach the same conclusion with respect to the proffered testimony of Dr. North. Dr. North would have testified that he evaluated defendant in April 2017 and found he was no longer an SVP.[15] The trial court could reasonably conclude that an SVP evaluation from two years ago was not relevant to the question whether defendant was *currently* an SVP, which was the question before the jury. (See CALCRIM No. 3454A.) No abuse of discretion appears from the exclusion of Dr. North's testimony.

No abuse of discretion appears from the exclusion of Pierce's testimony either. Pierce, a unit supervisor at Coalinga, would have testified that defendant had not acted out or exhibited behaviors common to persons with volitional impairment, such as possessing child pornography or behaving violently. We review the trial court's exercise of discretion on the basis of the facts known to the court at the time of its ruling. (*People v. Hendrix* (2013) 214 Cal.App.4th 216, 243.) Here, the trial court granted the prosecutor's motion to exclude Pierce's testimony as irrelevant and cumulative, but contemporaneously denied the prosecutor's motion to exclude the testimony of Drs. Hopkins and Cook. At the time of the trial court's ruling, Drs. Hopkins and Cook were each expected to testify about defendant's behavior in custody. On the record before us, the trial court could reasonably conclude that additional testimony concerning defendant's behavior would be cumulative, and any testimony concerning the behavior of other committed persons would be irrelevant. We perceive no abuse of discretion in the exclusion of Pierce's testimony.

---

[15] There was no proffer in the trial court as to Dr. North's conclusions.

No error appears from the trial court's ruling with respect to the proffered testimony of Dr. Hopkins. As noted, Dr. Hopkins was described as a unit psychologist at Coalinga and a member of defendant's treatment team. Dr. Hopkins was expected to testify about "how he's doing at the hospital; whether he's been going to classes, and what kind of behavior he has had there." The trial court denied the prosecutor's motion to exclude Dr. Hopkins's testimony. On cross-examination, defendant's trial counsel elicited hearsay evidence from Dr. Jeffrey Davis, based on his conversations with Dr. Hopkins. When challenged, defendant's trial counsel represented that he would not call Dr. Hopkins as a witness and then proceeded to elicit more hearsay evidence from Dr. Davis. The trial court did not force or even suggest this arrangement. On the record before us, we do not even find a ruling that can be said to have been adverse to defendant, let alone a manifest abuse of discretion. We reject the claim of error.[16]

That leaves Dr. Cook. No abuse of discretion appears here either. Dr. Cook would have testified that he treated defendant for depression and observed that defendant was compliant with his medication, regularly attended treatment and meetings, and showed no signs of aggression at Coalinga. As noted, the trial court denied the prosecutor's initial motion in limine to exclude Dr. Cook's testimony on grounds of relevance but granted her renewed motion after Dr. Jeffrey Davis completed his testimony. The trial court observed that Dr. Cook was not an SVP evaluator, and thus not qualified to render an opinion on defendant's risk of reoffending. The trial court also observed that Dr. Davis had already testified to defendant's behavior in the hospital. Under the circumstances, the trial court concluded that Dr. Cook's testimony was unnecessary and would require an undue consumption of time. We cannot say the court

---

[16] To the extent defendant claims ineffective assistance of counsel based on his trial counsel's election to not call Dr. Hopkins, we reject that claim as well.

abused its broad discretion. Dr. Davis unambiguously testified that defendant behaved appropriately in custody. Dr. Davis also testified that defendant participated in treatment, though he failed to complete a treatment program (a fact no party disputes). Additional testimony from Dr. Cook would not have been necessary to show that defendant was not acting out in custody. Defendant emphasizes that Dr. Cook would have also testified about his compliance with treatment for depression, but does not explain how that testimony would have been relevant to his diagnosed mental disorder of pedophilia (which, again, was undisputed), or how compliance with treatment for depression would bear on his risk of reoffending. We find no error.

F.      *Cumulative Prejudice*

Finally, defendant contends the cumulative effect of the errors in his case denied him a fair trial. (*People v. Hill* (1998) 17 Cal.4th 800, 844-845 [a series of trial errors, though independently harmless, may rise to the level of prejudicial error].) As we have either rejected the merits of defendant's claims of error or found any asserted errors to be nonprejudicial, we reject his contention that the judgment must be reversed for cumulative error.

## III.  DISPOSITION

The judgment is affirmed.


/S/

RENNER, J.


We concur:


/S/

ROBIE, Acting P. J.


/S/

MURRAY, J.